In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 20-2614 & 20-2703

DANNY WILBER,

*Petitioner-Appellee,*
*Cross-Appellant,*

*v.*

RANDALL HEPP, Warden,

*Respondent-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 1:10-cv-00179-WCG — **William C. Griesbach**, *Judge.*

ARGUED FEBRUARY 10, 2021 — DECIDED OCTOBER 29, 2021

Before MANION, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted Danny Wilber of
murder in Wisconsin state court, and he was sentenced to a
life term in prison. After unsuccessfully challenging his con-
viction in state court, Wilber sought relief in federal court pur-
suant to 28 U.S.C. § 2554, arguing among other things that he
was deprived of his right to due process under the Fourteenth

Amendment when he was visibly shackled before the jury during closing arguments. The district court issued a writ of habeas corpus on that claim, concluding that the Wisconsin Court of Appeals decision sustaining the shackling order amounted to an unreasonable application of the United States Supreme Court's decision in *Deck v. Missouri*, 544 U.S. 622, 125 S. Ct. 2007 (2005). Because neither the trial judge nor the state appellate court ever articulated a reason why Wilber had to be *visibly* restrained in the jury's presence, we agree with the district court that the shackling decision ran afoul of *Deck*. And because Wilber was visibly restrained at a key phase of the trial, when the State highlighted evidence that, in the moments leading up to the murder, Wilber's behavior was "wild," "crazy," "possessed," and "out of control," we also agree with the district court that Wilber was prejudiced by the shackling error. The restraints would have suggested to the jury that the court itself perceived Wilber to be incapable of self-control and to pose such a danger that he must be manacled in order to protect others in the courtroom, including the jurors. We therefore affirm the district court's decision to grant a writ of habeas corpus.

## I.

Wilber was convicted for the murder of David Diaz in Milwaukee Circuit Court, Judge Mary M. Kuhnmuench presiding. Wilber attended an after-hours house party at Diaz's home in Milwaukee during the night of January 30-31, 2004. According to witness statements made to the police in the days after the incident, Wilber had been acting belligerently at the party; when his belligerence escalated into a physical confrontation with other guests, several men attempted to subdue him and persuade him to leave the party. At that

point, a shot rang out, Diaz fell dead to the floor, and partygo-ers fled the house. Jeranek Diaz (no relation to the victim) ("Je-ranek") reported that he saw Wilber pointing a gun at Diaz just prior to the shooting. When Jeranek heard the gunshot, he turned in Wilber's direction and saw Diaz's body strike the floor and Wilber tucking the gun under his coat. He believed that Wilber fired the shot because the sound came from where Wilber was standing several feet away. A second witness, Richard Torres, told police that he saw Wilber with a gun in his hand immediately after the shooting. Both men also re-ported that in the aftermath of the shooting, they heard Anto-nia West, Wilber's sister, cry out, "[O]h my God. You shot him. Get out of here. You shot him." Having seen Wilber with a gun, Torres assumed that he was the shooter. When Torres heard West's exclamation, "[i]t convinced me more that he did." R. 61-24 at 282–83.

At trial, all of the witnesses called by the State denied see-ing who shot the victim, including Jeranek, who disclaimed the statement attributed to him by the police. But the trial tes-timony nonetheless did point the finger at Wilber as the likely shooter. Our summary of this testimony derives verbatim from the Wisconsin Appellate Court's decision resolving Wil-ber's post-conviction appeal.

* * *

Milwaukee Police Officer Thomas Casper testified that he created a diagram of the crime scene showing the locations of all the physical evidence. Diaz's body was facedown in the kitchen with his head facing north. Bullet fragments were found behind the stove in the northeast corner of the kitchen. During the investigation, the eyewitnesses from the kitchen explained to detectives where everyone had been standing by

placing "x's" with people's names or initials on diagrams of the kitchen.

Investigator William Kohl testified about the layout and dimensions of the kitchen. Kohl testified as to where the appliances were located, which portions of the kitchen were visible from different angles and from other parts of the house, and where Diaz's body was found in relation to the measurements of the kitchen.

Wilber's sister, Antonia, testified that she, Wilber, and other family members went to the house party in the early morning hours of the shooting following a night out at a local bar. Antonia denied saying "[y]ou shot him. Get out of here" to Wilber, but told the jury that she had to tell Wilber to "calm down" multiple times because Wilber "got into it" with another party-goer, Oscar Niles. Antonia also testified that Wilber grabbed and choked another man in the kitchen. Antonia said someone tried to grab Wilber from behind to stop the choking. Antonia was also in the kitchen at the time of the choking incident. She said the next thing she remembered was the sound of the gunshot coming from Wilber's direction.

Wilber's cousin, Donald Jennings, told the jury that he also attended the house party and was standing in the kitchen when Wilber got into an altercation with Niles. He testified that Wilber got aggressive with Niles and Jeranek intervened. Jennings said the parties "got to tussling and they grabbed each other. And that's when the shot was fired, hitting the man that was [found] laying on the ground." Jennings did not say that he saw Wilber shoot Diaz, but stated that he "yelled" at Antonia when they left the party because "she was saying, my brother, my brother, I can't believe this shit[.]" Jennings

interpreted Antonia's statement to mean that Antonia saw her brother shoot Diaz.

Two other witnesses, Lea Franceschetti and Jaimie Williams, also testified that they heard Antonia say "I can't believe he did that," and "I can't believe he shot him." Franceschetti stated that she interpreted Antonia's statement to mean that Antonia knew the shooter.

Torres testified that he was also in the kitchen at the time Diaz was shot. He stated that immediately after the shooting he saw Wilber with a gun. Torres stated that Wilber, while in the kitchen, was acting aggressively towards other guests. Diaz, who was also in the kitchen, told Jeranek to ask Wilber to leave. Wilber "didn't want to hear that" and started choking Jeranek, who was standing next to Diaz. Torres intervened and got into his own altercation with Wilber. Wilber hit Torres, causing Torres to "black out a little bit" and "lean[ ] up against the … sink." Torres said he then heard a gunshot from "the right side of my … ear," where he said Wilber was standing. Torres said that he saw Wilber with a gun after the shooting "in a crouched position." Torres stated that he heard someone in the kitchen yell "you shot the guy," and then Wilber ran out. Torres stated that he tried to chase Wilber but lost him in the chaos.

Torres also testified that he saw a man named "Ricky" at the party with a gun, but that he did not see Ricky in the kitchen at the time of the shooting. Torres stated that there was no tension between Diaz and Ricky, but that the two exchanged "dirty looks" the week before. Torres stated that there did not appear to be tension between Diaz and Ricky at the party and that Torres was not concerned about Ricky's possession of a gun.

Jill Neubecker testified that she lived in the upper portion of a duplex above Wilber's sister, Wanda Tatum. She testified that police came to the house looking for Wilber on February 1, 2004. She told them that the night before, she smelled something on fire and saw smoke coming from an old grill in the back yard. Detective Joseph Erwin found the soles of a pair of shoes burnt in the grill.

The police officers who had interviewed Antonia, Williams, Niles, and Jeranek testified about statements they gave that were inconsistent with their trial testimony.

Mark Bernhagen, a shoe store manager, testified for the defense about shoe sizing. He testified that Wilber's feet were size fourteen and one-half. The soles of the burnt shoes found in the grill were size twelve, which were smaller than the shoes Wilber was wearing at trial.

Shortly after the defense rested, defense counsel asked for an adjournment, telling the trial court that during the break, an eyewitness approached counsel and said that he saw "another person shooting the shot that struck the head of David Diaz." Counsel told the court that neither he nor Wilber was aware of the potential witness until that moment. The trial court allowed defense counsel to make an offer of proof.

Defense counsel called two of Wilber's sisters, Tatum and Monique West. Tatum told the court that six days after the trial began, Monique told Tatum "if my brother was found guilty this person was supposed to give a confession saying he did it." She stated that this information came from Monique's boyfriend, Roberto Gonzalez, who told Monique that if Wilber was convicted, another person would come forward and confess to the shooting. According to Tatum,

Gonzalez told Monique that he and "Isaiah" were at the party the night of the shooting. Gonzalez told Monique that he heard Diaz tell his girlfriend to go get a gun, and in response, Isaiah pulled out a gun that went off and hit Diaz. Monique conveyed this information to Tatum. Tatum said she first learned that Gonzalez claimed to be at the house "a while ago," but she did not tell defense counsel because she did not "know that that was relevant."

Monique also testified, telling the trial court that her boy-friend, Gonzalez, told her that he witnessed Isaiah shoot Diaz. Monique stated that she told Tatum about Gonzalez's observation on the fourth day of trial, but could not explain why she did not tell counsel or anyone else. When asked whether she heard of the plan for someone else to confess if Wilber was convicted, Monique said she heard it from Tatum. The State asked, "So the notion or the idea or the fact that Isaiah's going to confess to this came from Wanda to Monique, not from Monique to Wanda?" Monique answered, "Right."

The trial court denied defense counsel's request to investigate the matter, stating that the sisters' testimony was inconsistent, lacked corroborating evidence, and was an "attempt to manipulate proceedings."

*State v. Wilber*, 385 Wis.2d 513, 2018 WL 6788074, at *1–3 ¶¶ 3–16 (Wis. App. Dec. 26, 2018) (unpublished).

* * *

To the foregoing summary of the evidence from the state appellate court's decision we offer a few additional observations about the State's case against Wilber.

The physical evidence posed some difficulties for the State's theory. At the moment of the shooting, Diaz evidently

had been standing in a doorway between the living room and the kitchen. The living room was in the middle of the house, with the kitchen to its north. Diaz was shot at close range in the back of the head, and the position of his body on the floor of the kitchen was consistent with the possibility that he had fallen forward (from south to north) into the kitchen. Bullet fragments were found on the north side of the kitchen, which was also consistent with the possibility that Diaz was shot from behind in a south-to-north direction. By all witness accounts, however Wilber had been standing in the kitchen—in front of where Diaz was standing, not behind him—at the time of the shooting. Also, according to witnesses, the gun that Wilber was seen holding was a semi-automatic, which would have ejected a casing; but no such casing was found, and a firearms examiner testified that Diaz was shot with a revolver. No forensic evidence was presented as to the likely trajectory of the bullet after it left Diaz's body or as to the existence of any indication of bullet ricochet, blood-spray patterns, or the like.

But the State was not wholly without answers to the questions posed by this evidence. Among other points, the State noted in closing arguments that the relatively small kitchen was crowded with people at the time of the shooting; the moments immediately before and after the shooting were chaotic; those in the kitchen bolted after the shooting, presenting the possibility that Diaz's body was jostled as or after it fell to the floor; the trajectory of the bullet through Diaz's head was in a downward direction, indicating that the gun was pointed in a downward direction when he was shot; Wilber, who was six feet, seven inches tall, stood significantly taller than Diaz (five feet, eight inches) or anyone else in the kitchen and, assuming Diaz was standing upright at the time of the shooting,

was likely the only person who could have shot him in a downward direction; Jeranek had told the police that Diaz had turned away from Wilber just prior to the shooting, which would explain how Wilber could have shot him in the back of the head; and although bullet fragments had been found on the north side of the kitchen, as police testimony had indicated, bullets often strike other objects and ricochet before coming to rest in unexpected places.

One of Wilber's ankles was manacled and connected to an eye bolt on the courtroom floor throughout the trial, but until the final day of the trial, no restraints were visible to the jury—both counsel tables were draped so as to hide the restraints. This remained true even after the judge subsequently increased the number of deputies stationed inside and outside of the courtroom and ordered a stun belt added to Wilber's restraints. But on the last day of trial, just prior to final jury instructions and closing arguments, the judge ordered that the restraints be expanded to include wrist and shoulder restraints, both of which were visible to the jury. These visible restraints are what give rise to Wilber's due process claim.

To set the stage for our analysis of this claim, we think it important to set out in some detail the events that culminated in the trial court's decision to visibly shackle Wilber and the court's rationale for the escalating measures it took to restrain Wilber during the trial. With minor modifications, we incorporate the following account from the district court's thorough opinion.

* * *

Beginning the first day of trial before jury selection had even begun, the trial judge cautioned Wilber that he would

not be allowed to make "facial gestures," "sounds," "act imprudently," or "be disrespectful" to the court. R. 61-17 at 4. The judge stated that she had noticed during the morning session that Wilber was reacting inappropriately to the arguments of the prosecutor: "[E]very time Mr. Griffin would make some comment that—in terms of how he was going to couch this—this evidence, and why he thought it was admissible, your head was straining at the bit at times looking back at him and—and maybe it was just a reflex on your part." *Id.* at 5. When "we're in front of the jury," the court warned, this would not be allowed:

> You can't do that. You have to face frontwards at all times. You're not allowed to look back into the gallery. You're not allowed to turn back and make faces or gestures at the State table. You're supposed to be sitting straight in front in your chair, eyes forward, confer with your lawyer, but always facing this direction.

*Id.* at 5. The court offered two reasons why such behavior would not be allowed:

> One, because it's disrespectful, and I'm going to have to take some steps to stop you if you don't do it, if you don't stop, and I don't want to have to do that. And the second thing is it's—it's bad for you and it looks bad in front of a jury. So I'm going to ask you to be careful about how you act and how you react to the different things that happen during a trial here.

*Id.* at 6. Wilber's attorney explained to the judge that his client meant no disrespect but had worked closely with counsel on

preparing his defense, was familiar with the legal arguments, and strongly disagreed with the court's ruling. *Id.* at 6. Disagreement was fine, the judge noted, but "[w]hat I'm trying to tell you is it's a disrespect to the court to show you disagree." *Id.* at 7. "You have to keep a poker face," she continued, noting that it was in his interest to do so because it "looks bad in front of the jury." *Id.* at 7.

On the second day of trial, the court also noted that it had taken all the necessary steps to make sure this is "a safe proceeding." R. 61-18 at 75. The court noted that Wilber was to remain shackled throughout the trial. A bracelet had been attached to one of Wilber's ankles and anchored to the floor beneath the defense table. The court also noted that steps had been taken to prevent jurors from becoming aware that Wilber was shackled and maintain the presumption of innocence to which he was entitled. Both the prosecution and the defense tables were skirted to prevent the shackles from being visible to the jury. *Id.* at 75–76. In addition, the court noted that the defendant was allowed a change in the civilian clothes he was wearing "so all steps—reasonable steps are being made to continue to have the presumption of innocence for the defendant protected." *Id.* at 76.

At the same time, however, the court expressed its view "that even if jurors do see an individual defendant secured in some fashion that that sight or that observation in and of itself is not enough for a default of that particular juror or that they are somehow exempted." *Id.* at 76. "There has to be something about those observation[s]," the court continued, "that ha[s] affected them one way or the other that they articulate to the

parties and to the court—that would cause them to be an unsuitable juror." *Id.* at 76.[1]

After two days of jury selection and several lengthy discussions of legal issues, the attorneys gave their opening statements on the third day and began the presentation of evidence. When the jury was released for lunch, the court granted the prosecution's request over the objection of the defense that two of the State's witnesses be instructed to review their prior written statements to the police over the break so that their direct examinations could proceed more efficiently. In response to the court's ruling, Wilber stated, "It's not new." R. 61-20 at 116. The court instructed Wilber to "[s]top it," to which Wilber responded, "You are granting everything the D.A. is throwing at you." *Id.* at 116. As the court ordered the courtroom deputies to remove Wilber from the courtroom, the discussion continued:

> THE DEFENDANT: What haven't you denied, that's nothing new. Put that on the record. I'm speaking up on my behalf. This is my life.
>
> THE COURT: Mr. Chernin, please talk to your client.
>
> MR. CHERNIN: I will, Your Honor.
>
> THE COURT: Thank you.

---

[1] The court was referring to a prior incident which had given rise to concern that two jurors might have seen Wilber with his ankle restraint exposed. The court had questioned the jurors and was satisfied that neither had seen anything that might affect his or her ability to remain impartial. R. 61-18 at 4, 21-26, 73–74.

THE DEFENDANT: You don't intimidate me with that shit, man.

THE COURT: Mr.—Mr. Wilber.

THE DEFENDANT: You gonna hold me in contempt? What, you gonna hold me in contempt. It's my life right here.

THE COURT: Mr. Wilber, I'm going to if you don't –

THE DEFENDANT: Do it.

THE COURT: Settle down and behave.

MR. CHERNIN: Danny, please relax.

THE COURT: If you don't behave—

THE DEFENDANT: It ain't doing me no good her overruling—sustaining everything he throw out whether it is bogus or not.

THE COURT: Mr. Wilber, you are doing yourself no good.

*Id.* at 116–17.

After lunch, before the trial resumed, the trial court again cautioned Wilber that he had to stay in control when he was in front of the jury. R. 61-21 at 3. Wilber stated he understood and was "all right." *Id.* at 4. The court then stated that it wanted to make a record of the fact that it had added additional security in the courtroom. It added two additional deputies in the courtroom, bringing the total to four, and had also added a stun belt to Wilber's arm that one of the deputies would control as "a way of keeping you safe, everybody around you safe, the staff safe and the jury safe so that the trial

can continue without hopefully any additional incidences." *Id.* at 4–5. These steps were necessitated, the court explained, "because of some of the statements that you made to the court and to the deputies in—I'm hoping was a moment of anger, but when you make those kinds of statements and you indicate that you don't really have any respect for my authority or for the authority of the deputies, it becomes a—a real safety concern, an issue for everyone involved in the trial, and it doesn't do anybody any good." *Id.* at 5.

On the fourth day of the trial, as the morning session was ending, the trial court advised the jury that they would be sequestered during the day over their breaks and when coming to and leaving the courtroom. R. 61-22 at 104–07. The sequestration was "to avoid even the appearance of somebody suggesting that the jury was somehow tainted, talking or overhearing conversations in the hallway, talking to people." *Id.* at 106. After the jury left the courtroom, the court set forth the reasons for the sequestration order and additional measures that were being implemented.

The court noted that specific issues had arisen over the course of the trial requiring that additional security measures be taken and that the jury be sequestered. *Id.* at 107. Referring back to Wilber's outburst at the court's ruling the previous day, the judge stated that Wilber had been highly agitated, not only with the court, but according to the deputies, also with anyone who was in the holding or "bullpen" area and even with his own attorney. The judge noted that the deputies had advised her that Wilber made certain statements to them, such as "[I am] not going down for this, you might as well use your gun and kill me now." *Id.* at 110–11. Wilber also asked detailed questions about the paths he would walk to the

courtroom each morning, what floors they would be on, and who would have access to that same path. These questions alarmed the deputies and suggested that Wilber might attempt to flee, potentially with the help of others. *Id.* at 111.

The court also expressed concern that three men had approached the trial court's clerk and made comments that were ill-advised at best, and a possible threat at worst. The three men had also watched the trial and were seen near witnesses who were under a sequestration order. Although Wilber denied any connection with the men (and the court did not find that there was a connection), the court noted their presence as an additional reason for its sequestration order and concern for security. *Id.* at 114–16, 120. The court added later that an individual had been caught by sheriff's deputies listening at a door that the judge used to access the courtroom; the deputies had to warn him away from the door multiple times. The court ultimately ordered him excluded from the courtroom along with another spectator who had been observed using his cell phone in the courtroom and loitering near trial witnesses. R. 61-23 at 155–58.

As a result, in consultation with the deputies, the court had decided that certain security measures would be added. First, two additional deputies would be added inside the courtroom and at least one outside. In addition, the court had agreed with the recommendation that a stun belt be placed on Wilber's arm under his shirt which would allow one of the deputies to administer a shock to him if he became disruptive. *Id.* at 110:03–16. The court explained that it wanted Wilber to continue to have the use of his hands, while continuing to be "fully restrained" with the ankle bracelet connected to the bolt on the floor. But the court also warned Wilber that, if any

further disruptions occurred, the court might order his hands secured and would instruct him to keep them out of sight below the defense table. And if that proved insufficient, the court might order him removed from the courtroom for the duration of the trial and have him participate in the proceedings via video. At the same time, the court acknowledged that there had been no problems with Wilber since his outburst the previous day. *Id.* at 112–13.

At the beginning of the fifth day of trial, the court returned to a discussion of an issue that the prosecutor had raised earlier—whether Wilber could be directed to participate in a courtroom demonstration intended to show the State's theory of how Wilber, given his height (six feet, seven inches), could have fired a gun at an angle at which the bullet would have caused the entrance and exit wounds to Diaz's head. R. 61-24 at 4–13. Wilber's attorney strenuously objected to forcing his client to, in effect, reenact the crime he was accused of committing before the jury. *Id.* at 32–33; 42. The question arose as to whether doing so might expose the stun belt around his arm. *Id.* at 44–45. As the court engaged Wilber's counsel in a discussion on that point, the court apparently heard Wilber sigh, which the court interpreted as a sign of disrespect. The court directed his attorney to warn him:

> Mr. Chernin, please advise him about his conduct in this court, because as I said the other day, I'm not going to have you folks mistake my kindness for weakness. I have been doing this as restrained as I can outside the presence of the jury, and given his outburst the other day, he's lucky he hasn't been charged with threatening a judge, that he hasn't been charged with

> disorderly conduct, that he hasn't been charged with contempt. And you know whereof I speak.

*Id.* at 46. As counsel attempted to explain that his client meant no disrespect, the court continued:

> And I am not going to continue to run my court with this gentleman, you know, being disrespectful to me from the minute he comes in the court till the minute he leaves. I'm not going to tolerate it and I don't have to, quite honestly. I don't have to. Tell me if I have to. I don't think I do. I don't think there's anything in the rules of judicial conduct that require a judge to be disrespected and do nothing about it. Tell me if I'm wrong. I'm not going to. Today's the end. You do it again, we are going to add additional restraints to you in front of the jury.

*Id.* at 46–47. The court directed Wilber's counsel to explain to Wilber the proper way of behaving in court and took a tenminute break to decide the issue before it and to allow counsel to converse with his client. *Id.* at 48–49.[2]

The trial proceeded to its conclusion with no further comments on the record about Wilber's behavior. It was after the

---

[2] A similar exchange and admonition had taken place on the day before, when the court was discussing the misbehavior of witness Oscar Niles, who among other things had winked at the defendant during his testimony. When the court raised the issue with Niles and with counsel after the jury was excused, it made clear that it was not attributing any misconduct on the part of Niles to Wilber. But while the judge was airing the issue, the judge observed Wilber smiling or laughing at one point and chastised him for evidently finding the situation humorous. R. 61-23 at 70–73, 159–61.

evidence was closed and just before closing arguments were to begin when defense counsel moved to reopen the case and allow him to investigate a report by Wilber's sisters that there was an eyewitness who saw someone else shoot David Diaz. The jury was excused from the courtroom while the defense made its offer of proof and the trial court delivered its ruling denying the defense's motion to reopen the case and its follow-on motion for a mistrial.

At that point, before the jury was brought back into the courtroom for final instructions and closing arguments, the court announced that Wilber had been placed "in a secured wheelchair with—not only secured at his ankles but at his wrists." R. 61-28 at 100. His ankle remained attached to a bolt on the floor, but now his hands were chained together at the wrists and two-inch wide black straps secured him to the wheelchair at his right wrist and at both of his upper arms just below the shoulder. *Id.* at 197; R. 69–73. (See the appendix at the end of this opinion for a photograph of Wilber so shackled.) The court stated that "Mr. Wilber is responsible for his own predicament and for his own position, that is to be restrained and to have that obvious restraint being shown to the jury." R. 61-28 at 100. His behavior throughout the trial, the court stated, "has been contemptible." *Id.* at 100.

The trial court went on to summarize Wilber's previous behavior and the measures taken to ensure the trial would proceed in an orderly and safe manner. Describing Wilber's previous behavior, the court stated:

> This defendant, through his gestures, through his facial gestures at the court, through his facial expressions, through his body language, through his tone, and most particularly through

> his language, including the tirade that he had at
> the end of the second day or the end of the sec-
> ond morning of this trial, directed at this court,
> and challenging this court, quite honestly, to
> find him in contempt, thereby setting the stage
> for his defiance throughout the proceedings.

*Id.* at 101. The court then noted that in response to this behavior, additional deputies had been stationed in the courtroom and a stun belt had been placed on Wilber's right arm. This was in addition to the bracelet around his ankle that was anchored to the floor under the defense table where Wilber was seated.

The judge stated that she had thought these measures, along with her words of advice, would be enough "to get him to understand that such disrespect to the court to these proceedings was not going to be tolerated." *Id.* at 103. "Apparently," the judge concluded, "it was not a sufficient amount of restraint[.]" *Id.* at 103. She then explained why:

> [O]n today's date the defendant used absolutely
> inappropriate, vulgar, profane language to the
> deputies who were in charge of security of this
> courtroom, and will not be tolerated or ac-
> cepted. He also physically fought with the dep-
> uties, such that they had to decentralize him in
> the back hallway leading back to the bullpen.
>
> That conduct will not be rewarded, it will not be
> tolerated, and I will not be manipulated into

allowing a defendant, by his actions, to dictate
how I run this court.

*Id.* at 103–04.[3]

The court noted that "we're at the stage where we charge the jury, we have closing arguments, where quite honestly the State is going to be making their closing argument that I'm sure is going to have parts of it that the defendant is going to simply find annoying, wrong, incorrect, lying, disrespectful of him, and if he was already demonstrating to me at the very beginning of these proceedings that he didn't agree with my rulings and was going to act out, God only knows how he's going to react when the State starts making its closing argument and summing up what it believes the evidence is showing or not showing in this case." *Id.* at 104. Not wanting to risk any "further physical outburst of any kind by this defendant in the presence of the jury," *id.* at 105, the judge stated, "I will not be dissuaded from having him in any less secure form than he is right now." *Id.* at 105.

Wilber's attorney objected, noting that Wilber's appearance in the wheelchair was "disturbing because it looks absolutely horrible" and that there were constitutional problems with the restraints. *Id.* at 105. The trial court reminded counsel that Wilber had been admonished for his behavior and that the restraints had been progressive. *Id.* at 106–07. It explained that there was precedent for taking these extra measures and described an incident years earlier in which another defendant, who was not restrained, was shot and killed by law enforcement upon the reading of a verdict in that courtroom. *Id.*

---

[3] The record does not supply any further details concerning Wilber's behavior with the deputies apart from what the court itself reported.

at 107. The court determined that it was "taking the appropriate measures" in this case, "given this gentleman's behavior and his tone and tenor with the court." *Id.* at 108. Counsel requested that the court proceed without the visible restraints and instead limit the restraints to those he had worn prior to that day, noting that it was in his interest to avoid misconduct in front of the jury and reminding the court that Wilber had not engaged in any misconduct in front of the jury up to that point. *Id.* at 110, 111–12. The court denied the request, noting that Wilber was someone who "by his own language and conduct" toward the court and court staff posed a security threat. *Id.* at 111. Shortly thereafter, the trial court instructed deputies to bring the jury into the courtroom. As they moved to do so, the prosecutor offered to see if his office had a sport coat or blazer that Wilber could wear, presumably to cover the visible restraints. *Id.* at 113. The trial court, without explanation, responded, "That's not necessary." *Id.* at 113. The jury thereupon entered the courtroom, and the closing arguments proceeded without incident. The court then directed the jury to begin deliberations. *Id.* at 197. *See Wilber v. Thurmer*, 476 F. Supp. 3d 785, 790–95 (E.D. Wis. 2020).

\* \* \*

After the jury retired to deliberate, the defense moved for a mistrial based on the decision to place Wilber in restraints that were visible to the jury. Wilber's counsel argued that the decision violated his rights under the Fifth, Sixth, and Eighth Amendments of the United States Constitution and Article I, section 7 of the Wisconsin Constitution. R. 61-28 at 199. The court denied the motion. The court noted for the record that it had offered to give a cautionary instruction admonishing the jurors to make their decision based on the evidence rather

than the appearance of the defendant, but the defense had declined the court's offer. *Id.* at 200–01. Wilber's counsel acknowledged the offer, but added:

> I'm not certain if there's any instruction that could be fashioned, that would take away the impact of what Mr. Wilber was presenting to the jury as a result of the physical constraints placed upon him, and that's my concern. … I'm not certain what you can tell the jury that would take away the stain of what's visible.

*Id.* at 201.

The jury convicted Wilber on the sole charge submitted to it: first degree homicide with a dangerous weapon. The court ordered him to serve a life term in prison with the possibility of release on extended supervision after 40 years.

Wilber subsequently sought post-conviction relief, arguing, *inter alia*, that it was improper to order that he be visibly restrained during closing arguments. The trial court denied the petition without a hearing. R. 61-2.

Wilber then appealed his conviction, as relevant here renewing his contention that the trial court had abused its discretion in requiring him to appear before the jury in visible restraints and that he was denied a fair trial as a result of the court's decision.

The Wisconsin Court of Appeals affirmed his conviction. *State v. Wilber*, 314 Wis.2d 508, 2008 WL 4057798 (Wis. Ct. App. Sept. 3, 2008) (unpublished). With respect to Wilber's shackling claim, the court observed that the trial judge had engaged in a deliberate exercise of discretion and had been careful to explain her rationale each time she took additional

security measures, including imposing restraints on Wilber's person. The judge had reasonably concluded that the restraints on Wilber's wrists and arms were warranted by his verbal and physical altercation with the sheriff's deputies on the final day of trial. The appellate court rejected Wilber's contention that the judge had given undue weight to the shooting incident that had taken place in the same courtroom several years earlier, noting that the shooting was but one of myriad factors that the judge cited for her decision to order the additional restraints. The court found that the judge's decision was amply supported by the record and did not amount to an abuse of discretion. Finally, it did not believe that Wilber was denied a fair trial as a result of the visible restraints on his wrists and arms. *Id.*, at *7–8. The Wisconsin Supreme Court subsequently declined to hear the case. R. 61-7.

Wilber then pursued postconviction relief pursuant to Wis. Stat. § 974.06. As relevant here, Wilber asserted that there was insufficient evidence to support his conviction and that defense counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal. The circuit court denied his section 974.06 motion. Wilber again appealed.

The appellate court affirmed the denial of his request for postconviction relief. *State v. Wilber*, *supra*, 2018 WL 6788074. In addressing Wilber's claim that defense counsel was ineffective for failing to challenge, on direct appeal, the sufficiency of the evidence underlying his conviction, the court found that the evidence was sufficient to support the conviction, such that it did not need to address this claim of attorney ineffectiveness. *Id.*, at *7. The Wisconsin Supreme Court again denied review. R. 69-13.

Wilber also sought relief pursuant to 18 U.S.C. § 2254 in the district court. He filed his original petition in March 2010, but at his request, proceedings in federal court were stayed while he continued to pursue remedies in state court for the various errors he alleged. Those remedies were fully exhausted in April 2019 with the Wisconsin Supreme Court's denial of his second petition for review. The habeas proceeding then moved forward in the district court. As relevant here, Wilber's amended habeas petition asserted the following two claims: (1) his right to due process was violated because there was insufficient evidence to support his conviction; and (2) the trial court violated his right to due process as set forth in *Deck v. Missouri* by ordering him visibly shackled to a wheelchair for closing arguments.[4]

Judge Griesbach granted the petition in part. *Wilber*, 476 F. Supp. 3d 785. He rejected, in the first instance, Wilber's claim that the Wisconsin Appellate Court had unreasonably applied *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), in finding the evidence sufficient to support the conviction. 476 F. Supp. 3d at 797–99. The state court had, consistently with *Jackson*, considered the record as a whole and found that a reasonable trier of fact could have found Wilber guilty beyond a reasonable doubt. Multiple witnesses had described Wilber's "aggressive[ ] and violent[ ]" behavior at the party just before Diaz was shot; two witnesses (Jeranek and Torres) had seen a gun in Wilber's hand just before and just after the shooting, and although Jeranek and other witnesses denied their prior statements at trial, those statements were admitted both to impeach their trial testimony and as

---

[4] Wilber also asserted claims of attorney ineffectiveness that neither Judge Griesbach nor we find it necessary to reach.

substantive evidence. Although Wilber had a reasonable argument (which his counsel had made to the jury) that the problematic physical evidence was inconsistent with the State's theory that Wilber was the shooter, the State itself had put forward testimony and argument responding to that argument. "While Wilber's evidence on its own, may paint one picture, the court of appeals reviewed the record in its entirety and came to the reasonable conclusion that the evidence was sufficient to sustain the conviction. That is all that is required of it, and thus, Wilber is not entitled to relief on this claim." *Id.* at 799.

But Judge Griesbach went on to conclude that Wilber was entitled to relief on his claim that the decision to visibly shackle him during closing arguments constituted a violation of his Fourteenth Amendment right to due process. *Id.* at 800–04. He reasoned that the Wisconsin Court of Appeals' failure to explain why *visible* restraints were necessary rendered its decision affirming the shackling order not only inadequate but an unreasonable application of federal law to the undisputed facts of the case. *Id.* at 802–03. Although, as the appellate court had pointed out, the trial judge addressed Wilber's behavior and the need for security on some eight occasions during the trial and her comments in that regard were extensive, a careful review of the record revealed no misconduct that warranted visible restraints. Only two instances of misconduct had taken place in the courtroom itself: Wilber's nonverbal reactions to the prosecutor's remarks on the first day of trial, and his argument with the judge on the third day of trial; both incidents had taken place outside of the jury's presence. There were no further incidents between the third and final days of trial. Although Wilber on the last day did engage in another altercation with the sheriff's deputies, that

incident, like his prior run-ins with them, had taken place outside of the courtroom. Even taking that incident into account, the judge gave no indication why the existing security measures—which by this time included the restraint on Wilber's ankle, which was anchored to the courtroom floor, the stun belt on his arm, four deputies in the courtroom, and one more stationed outside the courtroom door—were insufficient to address any safety threat to the judge, her staff, or the public. *Id.* at 800–01, 802. The district court expressed concern that some of the judge's comments justifying the new restraints suggested she was simply deferring to the wishes of the sheriff's deputies in that regard. *Id.* at 802–03. It was also troubled that other remarks suggested she viewed the additional, visible shackles as punishment for the disrespect Wilber had shown her over the course of the trial. *Id.* at 803. But even assuming the record supported the decision to order the additional restraints, the trial judge, like the state appeals court, had never explained why it was necessary for such restraints to be visible to the jury. *Id.* Supreme Court precedent on courtroom restraints made clear that visible restraints present a substantial risk of prejudice to the defendant and must be justified by case-specific reasons that justify visible restraints. *Id.* at 799–800. And yet the state courts had never explained why, if additional restraints on Wilber were necessary, they could not be concealed from the jury's sight. *Id.* at 800, 803. This omission was inconsistent with the Supreme Court's decision in *Deck*.

Initially, the district court did not think it necessary to consider whether Wilber had demonstrated that he was prejudiced by the visible shackles he wore during closing argument and jury instruction. *Deck* itself observed that visible shackles are inherently prejudicial, such that when a court

imposes such shackles on the accused without adequate explanation, he need not make a showing of actual prejudice in order to prevail on a due process claim; instead, the burden falls to the State to demonstrate beyond a reasonable doubt that the error did not contribute to the guilty verdict. 544 U.S. at 635, 125 S. Ct. at 2015 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828(1967)). "Respondent cannot meet his burden. Given the inconsistent testimony of the eyewitnesses and the physical evidence suggesting Wilber could not have fired the fatal shot, the error may well have contributed to Wilber's conviction." *Wilber*, 476 F. Supp. 3d at 804.

The court therefore granted Wilber relief under section 2254 and ordered him released from custody unless the State decided, within 90 days of the court's decision, to retry him. The court subsequently stayed that decision pending the resolution of this appeal and denied Wilber's motion for release on bond.

In successfully seeking a stay from the district court, the State pointed out as to the matter of prejudice resulting from a shackling error that *Deck* was a direct-review case, whereas this is a section 2254 habeas proceeding in which harmless-error review applies in virtually all cases of trial error. *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S. Ct. 1710, 1722 (1993). Thus, once a constitutional error has been established in a habeas proceeding, a court must consider whether the error "had substantial or injurious effect or influence in determining the jury's verdict." *Id.* at 637, 113 S. Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *see also Davis v. Ayala*, 576 U.S. 257, 267–68, 135 S. Ct. 2187, 2197–98 (2015); *Fry v. Pliler*, 551 U.S. 112, 121–22, 127 S. Ct. 2321, 2328 (2007). And it is the habeas petitioner who

bears the burden of demonstrating that the error had such an effect or influence. *Brecht*, 407 U.S. at 637, 113 S. Ct. at 1722.

> There must be more than a reasonable probability that the error was harmful. The *Brecht* standard reflects the view that a State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.

*Ayala*, 576 U.S. at 268, 135 S. Ct. at 2198 (cleaned up). Ultimately, a court may grant habeas relief only if it is in "grave doubt" as to whether the federal error had a substantial or injurious effect in determining the jury's verdict. *Id.* at 267–68, 135 S. Ct. at 2197–98.

Acknowledging that the *Brecht* standard as to prejudice applies here, the district court concluded that Wilber had adequately established prejudice from the shackling error. The court noted the physical evidence at the scene of the murder did pose difficulties for the State's case against Wilber. R. 100 at 3–4. In addition, none of the State's witnesses testified before the jury that they saw Wilber shoot Diaz. In that regard, the State relied on the out-of-court statements of Torres and Jeranek. But Torres had told the police, as he did the jury, simply that he saw Wilber with a gun and apparently assumed that Wilber had shot Diaz. Jeranek had indicated to the police that Wilber was the shooter, but he never signed a

written statement to that effect[5] and in his subsequent testimony denied having told the detective any such thing. R. 100 at 4. Additionally, the witnesses who saw Wilber with a gun described it as a semiautomatic weapon rather than a revolver. R. 100 at 4. Although the court did not question the sufficiency of the evidence to support Wilber's conviction, the weaknesses in the State's case caused it to have grave doubt whether the decision to shackle Wilber during closing arguments—"the very point in the trial where the jury's attention was likely most focused closely upon him"—had a substantial and injurious effect on the jury's verdict. R. 100 at 4.

## II.

The parties have filed cross-appeals from the district court's decision. The State has appealed the finding that Wilber was deprived of due process by being made to appear before the jury in visible shackles. Wilber has cross-appealed, challenging the court's holding that the state court reasonably applied *Jackson* in deeming the evidence sufficient to support his conviction. The district court issued a certificate of appealability as to that claim. R. 94. Wilber also pursues on appeal a claim that his trial counsel was ineffective, which the district court did not reach.

As relevant here, the Antiterrorism and Effective Death Penalty Act authorizes relief under section 2254 only when the state court's decision on the merits of a claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

---

[5] A written summary of Jeranek's oral statements to the police was prepared and orally approved by Jeranek, but he nonetheless refused to sign it.

the United States." § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if it either did not apply the proper legal rule or did apply the correct rule but reached the opposite result from the Supreme Court on materially indistinguishable facts. *E.g., Brown v. Finnan*, 598 F.3d 416, 421–22 (7th Cir. 2010). A state court decision amounts to an unreasonable application of Supreme Court precedent when it applies that precedent in a manner that is "objectively unreasonable, not merely wrong." *Woods v. Donald*, 575 U.S. 312, 316, 135 S. Ct. 1372, 1376 (2015) (per curiam); *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010). This is by design a difficult standard to meet. *Donald*, 575 U.S. at 316, 135 S. Ct. at 1376. A state court's application of Supreme Court precedent is not objectively unreasonable simply because we might disagree with that application, but rather only when no reasonable jurist could agree with it. *Ayala*, 576 U.S. at 269–70, 135 S. Ct. at 2199; *Donald*, 575 U.S. at 316, 135 S. Ct. at 1376; *Lett*, 559 U.S. at 773, 130 S. Ct. at 1862; *Williams v. Taylor*, 529 U.S. 362, 409–11, 120 S. Ct. 1495, 1521–22 (2000).

We affirm the court's decision to issue a writ of habeas corpus. Although, like the district court, we find no fault with the Wisconsin appellate court's decision as to the sufficiency of the evidence, we agree with the district court that the state court unreasonably applied *Deck* in sustaining the decision to order Wilber visibly shackled during final jury instruction and closing arguments. Whatever risks Wilber may have posed to the security and dignity of the trial proceeding, neither the trial judge nor the appellate court ever cited a reason why the additional restraints ordered for the final phase of the trial had to be restraints that were visible to the jury, nor is such a reason otherwise apparent from the record. *Deck* and its antecedents make clear that visible restraints are so

prejudicial to the defendant that they may be required only as a last resort. As Judge Griesbach reasoned, the decision to compel Wilber to be visibly shackled at a time in the trial when the jurors' attention was most likely to be focused on the defendant, was necessarily prejudicial. As we explain below, the restraints would have lent the court's implicit endorsement to witness accounts—highlighted by the prosecutor in his closing arguments—that Wilber was out of control at the time of the shooting. He is entitled to a new trial.

## A. *Sufficiency of the evidence*

Although, as we discuss below, Wilber is entitled to relief on his due process claim, that relief takes the form of a new trial. His claim as to the sufficiency of the evidence, on the other hand, would if successful bring his prosecution to a definitive end now. As the district court recognized, 476 F. Supp. 3d at 796, a finding that the evidence was insufficient to support a defendant's conviction "is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal rather than submitting the case to the jury." *Lockhart v. Nelson*, 488 U.S. 33, 39, 109 S. Ct. 285, 290 (1988) (citing *Burks v. United States*, 437 U.S. 1, 16–17, 98 S. Ct. 2141, 2149–50 (1978)). As a result, when an appellate court finds on direct review of a conviction that the evidence leading to that conviction was insufficient, the double jeopardy clause of the Fifth Amendment precludes a retrial on the same charge. *Burks*, 437 U.S. 18, 98 S. Ct. at 2150–51. This same rule applies in habeas proceedings as well. *See McDaniel v. Brown*, 558 U.S. 120, 131, 130 S. Ct. 665, 672 (2010); *Piaskowski v. Bett*, 256 F.3d 687, 694–95 (7th Cir. 2001). For this reason, we are obligated to address the sufficiency challenge first.

The rule of *Jackson v. Virginia* is a familiar one: A reviewing court must uphold a conviction so long as the trial evidence, viewed in the light most favorable to the prosecution, would permit a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. 443 U.S. at 319, 99 S. Ct. at 2789. It is difficult enough for a defendant to prevail on a challenge to the sufficiency of the evidence on direct review; it is even more so in a section 2254 proceeding, where the only question for a federal court is whether the state court's application of *Jackson* was objectively unreasonable. *Coleman v. Johnson*, 566 U.S. 650, 651, 132 S. Ct. 2060, 2062 (2012) (per curiam). Like Judge Griesbach, we find nothing objectively unreasonable about the Wisconsin Court of Appeals' decision finding the evidence sufficient to support Wilber's conviction.

To start, there can be no doubt that the Wisconsin Court of Appeals applied the correct standard. Although that court did not cite *Jackson* or a Wisconsin precedent that sets forth the same rule, a review of the appellate court's decision reveals that it conducted the appropriate inquiry. It canvassed the testimony given at Wilber's trial, considered the record as a whole in a light favorable to the State, and concluded that a reasonable factfinder could have found Wilber guilty beyond a reasonable doubt.[6] So the court's decision was not "contrary to" *Jackson.*

---

[6] As noted, the court considered the sufficiency of the evidence in the course of addressing a claim that Wilber made in his postconviction appeal, asserting that defense counsel was ineffective in failing to challenge the sufficiency of the evidence underlying Wilber's conviction on direct appeal. *See* 2018 WL 6788074, at *4 ¶ 23. The court made its finding in passing; but its conclusion as to the sufficiency of the evidence was unmistakable. *Id.*, at *7 ¶ 43 ("Because we have concluded that the evidence

The state court's decision also represents a reasonable application of *Jackson*. Viewed favorably to the State, there was ample evidence that would have permitted a reasonable trier of fact to find Wilber guilty beyond a reasonable doubt notwithstanding the oddities of the physical evidence. Jeranek told police that he had seen Wilber pointing a gun at Diaz, that he heard the gunshot coming from where Wilber was standing, and that he turned to see Wilber putting his gun underneath his coat. Immediately after the shooting, he heard West, Wilber's sister, exclaim, "Get out of here. You shot him." Although Jeranek, like other witnesses, disclaimed his prior statement to the police, an officer (under oath and subject to cross-examination) recounted the statement for the jury, and in accordance with the Wisconsin rules of evidence, the statement was admitted for its substance as well as its impeachment value. Wis. Stat. § 908.01(4)(a)(1); *Vogel v. State*, 291 N.W.2d 838, 844–45 (Wis. 1980). The jury reasonably could have credited Jeranek's out-of-court statement over his trial testimony. At the same time, Jeranek and Torres (among others) testified that Wilber was belligerent with other partygoers and that the belligerence escalated into violence. Torres testified that after Wilber struck him, he heard a shot ring out nearby, and turned to see Wilber with a gun. All of this evidence supports the jury's verdict.

To be sure, the physical evidence posed certain problems for the State's case as we noted earlier. The position of Diaz's body on the kitchen floor, coupled with the discovery of bullet fragments at the north end of the kitchen, suggested that he was shot (and fell) in a south-to-north direction. But Wilber

was sufficient and that defense counsel was not ineffective, we need not address this issue.").

was in the kitchen, to Diaz's north, not south at the time of the shooting. Ricky, on the other hand, who was also seen with a gun, had been seen in the living room of the house prior to the shooting.

But, as we have also discussed, the State's case was not entirely without answers to the questions posed by this evidence. Although Jeranek had told the police that he saw Wilber pointing a gun at Diaz, neither he nor any other witness admitted at trial that he saw the actual shooting, and thus there was no testimony in the trial record as to how Wilber and Diaz were positioned relative to one another at the precise moment of the shooting or as to how Diaz's body fell to the floor of the kitchen after he was struck by the bullet (whether his body may have spun around or instead fell straight downward, for example). As the State argued in closing, the kitchen was crowded with people and the moments just before and after the shooting were chaotic. Jeranek told the police that Diaz had turned away from and had his back to Wilber before the shooting, which would explain how Wilber could have shot him in the back of the head, if not how Diaz's body ended up facedown on the kitchen floor in a south-north direction. It is possible that Diaz's body was jostled while it was falling or after it fell to the floor. We also know from the testimony of multiple witnesses that Wilber's height relative to Diaz and the other individuals in the kitchen at the time made him a more likely candidate for having shot Diaz from above, in a downward direction consistent with the trajectory of the bullet. And although the witnesses who saw Wilber with a gun described it as a semi-automatic weapon, which is inconsistent with the forensic evidence, witnesses frequently are mistaken as to such details. So the jury might

reasonably have surmised that it was not physically impossible for Wilber to have shot Diaz.

On this record, the Wisconsin Court of Appeals reasonably concluded, consistently with *Jackson*, that a rational factfinder could have found Wilber guilty beyond a reasonable doubt. At least one eyewitness had effectively identified Wilber as the shooter to the police, and a second had seen a gun in Wilber's hand immediately after the shooting, and although the trial testimony of these and other witnesses was not as directly inculpatory as their out-of-court statements were, it still pointed the finger at Wilber as the shooter. Moreover, multiple witnesses had described Wilber's belligerent behavior at the party, which escalated to physical violence with multiple individuals just prior to the time at which Diaz was shot. The evidence was sufficient to support the conviction.

B. *Use of visible restraints*

The due process clause of the Fourteenth Amendment secures a state criminal defendant's right to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 1692 (1976); *see also Kentucky v. Whorton*, 441 U.S. 786, 790, 99 S. Ct. 2088, 2090 (1979) (Stewart, J., dissenting) ("a fair trial, after all, is what the Due Process Clause of the Fourteenth Amendment above all else guarantees"). Central to this right "is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 1345 (1986) (quoting *Taylor v. Kennedy*, 436 U.S. 478, 485, 98 S. Ct. 1930, 1934 (1978)).

For over 50 years, the Supreme Court has recognized that the fairness of a trial is brought into question when a defendant is made to appear before a jury bearing the badges of restraint. This is the very sort of circumstance that can divert the jury's attention and lead it to convict the defendant based on something other than the evidence put forward against him at trial.

In *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057 (1970), the Court sustained a trial court's decision to remove a perpetually disruptive defendant from the courtroom against a Sixth Amendment confrontation clause challenge. The Court recognized that there are alternative means of dealing with an obstreperous defendant that do not involve removing him from the courtroom, including binding and gagging him. But the Court was quick to recognize the serious problems with this particular option:

> Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

> Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint. It is in part because of these inherent disadvantages and limitations in this method of dealing with disorderly defendants that we decline to hold with the Court of Appeals that a defendant cannot in any possible circumstances be deprived of his right to be present at trial. However, in some situations which we need not attempt to foresee, binding and gagging might pos[s]ibly be the fairest and most reasonable way to handle a defendant who acts as Allen did here.

*Id.* at 344, 90 S. Ct. at 1061. *See also id.* at 345, 90 S. Ct. at 1062 (noting that option of imprisoning unruly defendant for civil contempt "is consistent with the defendant's right to be present at trial, and yet it avoids the serious shortcomings of the use of shackles and gags"); *id.* at 350–51, 90 S. Ct. at 1064 (Brennan, J., concurring) (noting that dealing with a disorderly defendant by binding and gagging him "is surely the least acceptable" of the options available to a judge: "It offends not only judicial dignity and decorum, but also that respect for the individual which is the lifeblood of the law.").

In *Estelle*, the Court concluded that compelling a defendant to appear before the jury in prison garb posed comparable difficulties. The court emphasized that the presumption of innocence is "a basic component of a fair trial," 425 U.S. at 503, 96 S. Ct. at 1692, and forcing a defendant to stand trial in jailhouse clothing tends to undermine that presumption:

"[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that … an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504–05, 96 S. Ct. at 1693. The Court went on to add that "[u]nlike physical restraints, permitted under *Allen*, … compelling an accused to wear jail clothing furthers no essential state policy." *Id.* at 505, 96 S. Ct. at 1693.[7]

By way of contrast, the Court concluded in *Holbrook* that the presence of multiple uniformed state troopers in the front row of the spectator section of a courtroom did not jeopardize the presumption of innocence in the same way as visible shackling and prison attire:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against

---

[7] Because the defendant in *Estelle* had never voiced an objection to his prison attire, the Court concluded that he had not, in fact, been compelled to appear before the jury in such attire, and thus no constitutional violation had occurred. 425 U.S. at 512–13, 96 S. Ct. at 1697.

> disruptions emanating from outside the court-
> room or to ensure that tense courtroom ex-
> changes do not erupt into violence. Indeed, it is
> entirely possible that jurors will not infer any-
> thing at all from the presence of the guards. If
> they are placed at some distance from the ac-
> cused, security officers may well be perceived
> more as elements of an impressive drama than
> as reminders of the defendant's special status.
> Our society has become inured to the presence
> of armed guards in most public places; they are
> doubtless taken for granted so long as their
> numbers or weaponry do not suggest particular
> official concern or alarm.

475 U.S. at 569, 106 S. Ct. at 1346.

Not until its 2005 decision in *Deck v. Missouri* did the Court actually articulate a rule as to when visible restraints may be used. Although its prior decisions had recognized the preju-dice that visible shackling poses to a fair trial, *Deck* was the first case in which the Court confronted head-on the question of whether and when the use of visible restraints during a criminal trial are consistent with the Constitution.

The defendant in *Deck* was compelled to appear in visible restraints—including leg irons, handcuffs, and a belly chain—during the penalty phase of his capital murder trial. During the guilt phase of the trial, the defendant had been restrained solely by leg braces that were not visible to the jury; but fol-lowing his conviction, the additional restraints were added and no attempt was made to hide them. The defense objected to the visible restraints, but the trial court overruled the objec-tion, with little explanation beyond the observation that the

defendant had already been convicted. The jury sentenced
Deck to death. In affirming the sentence, the Missouri Su-
preme Court reasoned that the decision to require Deck to ap-
pear before the jury in restraints was justified by a security
interest, in that the defendant was a repeat offender who may
have murdered his two victims in an effort to avoid a return
to custody.

The U.S. Supreme Court reversed, concluding that the
shackling decision had deprived the defendant of a fair trial
at the penalty phase. Although the Court acknowledged that
visible shackling may be permissible in limited circum-
stances, the trial court had never identified a circumstance
that warranted shackling Deck, let alone the need for *visible*
shackling. 544 U.S. at 634–35, 125 S. Ct. at 2015.

The Court began its analysis by finding it "clear" that the
Constitution did not authorize the use of visible shackles as a
routine matter during a criminal trial: "The law has long for-
bidden routine use of visible shackles during the guilt phase;
it permits a State to shackle a defendant only in the presence
of a special need." *Id.* at 626, 125 S. Ct. at 2010. The Court
traced the "deep roots" of this rule to Blackstone, who wrote
more than 250 years ago that a defendant "must be brought
to the bar without irons, or any manner of shackles or bonds;
unless there be evident danger of an escape." *Ibid.* (quoting 4
W. Blackstone, Commentaries on the Laws of England 317
(1769) (footnote omitted)). After surveying American prece-
dents on the subject, including its own observations in *Allen*,
*Williams*, and *Holbrook*, the Court summarized:

> [I]t is clear that this Court's prior statements
> gave voice to a principle deeply embedded in
> the law. We now conclude that those statements

identify a basic element of the "due process of
law" protected by the Federal Constitution.
Thus, the Fifth and Fourteenth Amendments
prohibit the use of physical restraints visible to
the jury absent a trial court determination, in the
exercise of its discretion, that they are justified
by a state interest specific to a particular trial.
Such a determination may of course take into
account the factors that courts have tradition-
ally relied on in gauging potential security
problems and the risk of escape at trial.

*Id.* at 629, 125 S. Ct. at 2012.

The Court went on to explain that the disfavor of visible
shackling was animated by "three fundamental legal princi-
ples": the presumption that a defendant is innocent until
proven guilty, a defendant's right to counsel to help him
mount a meaningful defense, and a judge's obligation to
"maintain a judicial process that is a dignified process." *Id.* at
630–31, 125 S. Ct. at 2013. With respect to the first of these
principles, "[v]isible shackling undermines the presumption
of innocence and the related fairness of the factfinding pro-
cess. It suggests to the jury that the justice system itself sees a
'need to separate a defendant from the community at large.'"
*Id.* at 630, 125 S. Ct. at 2013 (quoting *Holbrook*, 475 U.S. at 569,
106 S. Ct. at 1346). Second, restraints can interfere with the
right to defend oneself against the charge by making it more
difficult for a defendant to communicate with his counsel and
imposing an additional cost on the decision to give testimony
in his own behalf. *Id.* at 631, 125 S. Ct. at 2013. And third, with
respect to judicial decorum, the use of shackles tends to un-
dermine "[t]he courtroom's formal dignity, which includes

the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Ibid.*

The Court allowed that there will be cases in which the dangers of shackling cannot be avoided: "We do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations." *Id.* at 632, 125 S. Ct. at 2014.

However, the decision to compel a defendant to appear before a jury in shackles is one that must be tied to the specific circumstances of the case at hand, including any security risks that the individual defendant might pose. "[G]iven their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Ibid.*

The Court went on to apply this rule to the penalty phase of Deck's trial. Although of course the presumption of innocence was no longer at issue once Deck had been convicted, the deployment of visible shackles still presented perils to the fairness of the proceeding:

> The appearance of the offender during the penalty phase in shackles … almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community—often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point. It also almost

> inevitably affects adversely the jury's percep-
> tion of the character of the defendant. And it
> thereby undermines the jury's ability to weigh
> accurately all relevant considerations—consid-
> erations that are often unquantifiable and elu-
> sive—when it determines whether a defendant
> deserves death. In these ways, the use of shack-
> les can be a thumb on death's side of the scale.

*Id.* at 633, 125 S. Ct. at 2014 (citations and internal quotation marks omitted). Thus, at the penalty phase as well as the guilt phase of a trial, a judge may only require a defendant to appear in shackles if the circumstances warrant. "But any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial." *Id.*, 125 S. Ct. at 2015.

Having set out the rule that visible restraints at either phase of a criminal trial must be justified by case-specific circumstances, the Supreme Court rejected Missouri's assertion that the trial court had acted within its discretion in requiring Deck to be visibly shackled during the penalty phase of his trial. The Court observed in the first instance that there was no confirmation in the record that the trial judge saw the matter as one calling for the exercise of discretion. *Id.* at 634, 125 S. Ct. at 2015. The Court pointed out that the trial judge had not cited a risk of escape or a threat to courtroom security as a reason for the shackles. Instead, the judge had justified the shackles on the ground that Deck had already been convicted. *Ibid.* The judge had additionally remarked that the shackles might take fear out of the jurors' minds but had not cited any particular reason for the jurors to be afraid. *Ibid.* "Nor did he

explain why, if shackles were necessary, he chose not to provide for shackles that the jury could not see—apparently the arrangement used at [the guilt phase of the] trial." *Id.* at 634–35, 125 S. Ct. at 2015. "If there is an exceptional case where the record itself makes clear that there are indisputably good reasons for shackling, it is not this one." *Id.* at 635, 125 S. Ct. at 2015.

The Court concluded its decision with a rejection of Missouri's contention that the decision to shackle Deck was harmless. Shackling is "inherently prejudicial," the Court emphasized, although typically its negative effects will not be evident from the trial transcript. *Ibid.* (quoting *Holbrook*, 475 U.S. at 568, 106 S. Ct. at 1345). "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id.*, 125 S. Ct. at 2015–16 (quoting *Chapman v. California*, *supra*, 386 U.S. at 24, 87 S. Ct. at 828).

The Wisconsin Court of Appeals' decision affirming the shackling decision in this case cannot be reconciled with *Deck*. That court reasoned that, in view of Wilber's altercation with sheriff's deputies outside of the courtroom on the final day of trial, shackling Wilber was justified by his disruptive behavior and security concerns. But like the trial court, the appellate court never articulated why, to the extent the additional restraints were justified, they must be restraints that were visible to the jury.

To be clear, the state court's decision is not contrary to *Deck*. Although the appellate court did not cite *Deck* and

instead relied exclusively on state precedents, the court recognized that a criminal defendant has a right to a fair trial, that a defendant's freedom from physical restraints is an important component of a fair trial, that such restraints may nonetheless be appropriate when they are reasonably necessary to maintain order, and that the trial court, in the exercise of discretion, may require that a defendant be restrained so long as it puts its reasons for doing so on the record. *Wilber*, 2008 WL 4057798, at *7 ¶¶ 35–36. The framework that the Wisconsin Court of Appeals applied is faithful to *Deck*'s holding.

But the state court's analysis nonetheless represents an objectively unreasonable application of the rule set forth in *Deck*. As we discuss below, the state court lost sight of the inherent prejudice that visible shackles pose and wholly neglected to address why, in this case, the restraints imposed on Wilber had to be visible rather than concealed.

*Deck* makes clear that the Fourteenth Amendment prohibits a state court from compelling a defendant to appear in restraints that are visible to the jury unless, in the exercise of its discretion, the court concludes that visible restraints are justified by one or more state interests specific to the trial at hand. Such interests of course include security problems and the risk of escape.

Clearly the behavior of Wilber (and, of course, the other individuals present at the trial who engaged in suspicious behavior) posed potential threats to the security and orderliness of the courtroom that warranted the imposition of restraints. Wilber had engaged in multiple altercations with the sheriff's deputies who escorted him to and from court, at one point suggesting that he wanted them to kill him; his inquiries about the route the deputies would take in escorting him to

and from court suggested that he might be pondering an escape attempt; several individuals made odd remarks to the court clerk and one was caught listening at the door of the judge's private office, suggesting perhaps that these individuals might be in on such an attempt; and Wilber challenged the judge's authority and accused her of endeavoring to help the prosecution win its case. Even if most of this disruptive and threatening behavior took place outside of the courtroom—and none of it in the jury's presence—the trial court could reasonably conclude that restraints were warranted. At the same time, the court took care to ensure that such restraints were not visible to the jury: until the final phase of trial, Wilber was only shackled with an ankle restraint which was concealed behind a table skirt and later a stun belt on his arm that was hidden underneath his shirt.

But for closing arguments, the court concluded that additional restraints—over and above the ankle restraint and stun belt—were warranted by a recent verbal and physical altercation between Wilber and the deputies (outside of the courtroom); and in a departure from the care the court had taken with respect to the restraints previously imposed, no effort was made to hide these wrist and arm restraints from the jury's sight. The photograph of Wilber shackled to a wheelchair we have attached to this opinion leaves no doubt that the wrist and arm restraints were readily visible to the jury. Indeed, the state appellate court so found. 2008 WL 4057798, at *7 ("At issue is the visible, physical restraint of Wilber during closing arguments."). The wheelchair itself, which had not been used previously and which immobilized Wilber to the extent that he could not even stand up, would only have highlighted Wilber's enhanced state of restraint.

Although the trial court articulated a justification for its decision to impose still more restraints at the closing-argument stage of the trial, it offered no explanation—none—as to why these additional restraints had to be visible to the jury, even when Wilber's counsel objected repeatedly. By contrast, when the court had previously warned Wilber that it might order his wrists manacled if he engaged in any additional misbehavior, it suggested that his hands would be secured beneath the (skirted) defense table, out of the jury's sight. R. 61-22 at 112–13. And yet, when the prosecutor, in response to the defense objections, offered to obtain a sport coat for Wilber, presumably to help conceal the new restraints (whether partially or in whole), the court said that would not be necessary. Wholly absent from the trial judge's rationale is any discussion of why it was required or unavoidable for the new restraints to be visible, particularly when it had previously acknowledged that additional restraints could be hidden from the jury's view. In this respect, the instant case is on all fours with *Deck*, where nothing the trial judge had said regarding the shackling decision explained why it was that *visible* restraints were a necessity.

The appellate court, for its part, sustained the trial court's decision as appropriate given the circumstances we have discussed, without ever addressing the distinction between visible and concealed restraints or identifying why the trial court legitimately might have concluded that visible restraints were necessary. Like the trial court, its analysis focused on the propriety of ordering additional restraints, with no mention of whether these restraints could have been kept out of sight or why it was not feasible to do so.

*Deck* envisions there will be cases where visible restraints are necessary, 544 U.S. at 632, 125 S. Ct. at 2014; but at the same time, its discussion of the inherent prejudice posed by such restraints leaves no doubt that visible restraints may be required only as a last resort, *see id.* at 628, 125 S. Ct. at 2011 (quoting *Allen*, 397 U.S. at 344, 90 S. Ct. at 1061); *id.* at 635, 125 S. Ct. at 2015 (quoting *Holbrook*, 475 U.S. at 568, 106 S. Ct. at 1345). Visible restraints suggest to the jury that the court itself views the defendant as someone who is dangerous and must be physically isolated from others in the courtroom, thereby undermining the presumption of innocence. *Id.* at 630, 125 S. Ct. at 2013. Visible manacles also detract from the formal decorum of the courtroom that promotes respect for the defendant and dispassionate decisionmaking. *Id.* at 631–32, 125 S. Ct. at 2013.

The State goes so far as to suggest that, apart from justifying why additional restraints were necessary at the closing-argument stage, it was unnecessary for the court to explain why visible restraints, in particular, were necessary. But in two ways, *Deck* leaves no doubt that such an explanation is necessary. First, the entirety of the *Deck* decision hinges on the inherent prejudice posed by visible, as opposed to concealed, restraints. *See, e.g.*, 544 U.S. at 630, 125 S. Ct. at 2013 ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process."); *cf. Holbrook*, 475 U.S. at 568–69, 106 S. Ct. at 1345–46 (distinguishing the presence of uniformed troopers in courtroom, which support a benign inference, from shackling and prison clothes, which "are unmistakable indications of the need to separate a defendant from the community at large"). Second, lest there be any doubt on this point, the Court concluded that the Missouri trial judge's shackling decision could not be sustained as a

reasonable exercise of discretion in part because the judge had never explained why, if restraints were necessary, they must be visible. 544 U.S. at 634–35, 125 S. Ct. at 2015. Our own jurisprudence reflects an understanding that *Deck* requires a court to weigh the interests in courtroom security and decorum against the prejudice to the defendant posed by visible shackles. *See Lopez v. Thurmer*, 573 F.3d 484, 493 (7th Cir. 2009) ("the analysis set forth by the Supreme Court's cases requires a balancing of the need for security and order during a trial *against any prejudice that the defendant might suffer in the eyes of the jury*") (original emphasis removed; new emphasis ours); *Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007) ("a defendant's general right to be free of restraints in the courtroom is not absolute, but rather it is based on a balancing of the defendant's right *not to be viewed in a prejudicial light by the jury* against the court's need for security") (emphasis ours); *Stephenson v. Wilson*, 619 F.3d 664, 668–69 (7th Cir. 2010) ("Even when a visible restraint is warranted by the defendant's history of escape attempts or disruption of previous court proceedings, it must be the *least visible secure restraint*, such as, it is often suggested, leg shackles made invisible to the jury by a curtain at the defense table.") (citations omitted) (emphasis ours); *United States v. Jackson*, 419 F. App'x 666, 670 (7th Cir. 2011) (non-precedential decision) ("Because Jackson's leg restraints were not visible to the jury, we conclude on the record before us that his right to due process was not violated. In *Deck* the Supreme Court addressed only the question whether *visible* restraints offend the Constitution.") (emphasis in original). The balancing explicitly required by *Deck* is necessarily incomplete if the court does not consider whether the prejudice to the defendant can be minimized or avoided altogether by concealing the restraints.

The district court cited two additional reasons for concern about the shackling decision in this case which we do not factor into our own decision. The court raised the possibility that the trial judge may have given too much deference to the deputy sheriffs in deciding that the additional restraints were necessary for the closing phase of the trial. 476 F. Supp. 3d at 802–03, citing *Lopez*, 573 F.3d at 493 n.4 ("[T]he actual due process decision must be made by the judicial officer. Law enforcement officials hardly can be said to be neutral in balancing the rights of the defendant against their own view of necessary security measures."), and *Woods v. Thieret*, 5 F.3d 244, 248 (7th Cir. 1993) ("While the trial court may rely 'heavily' on the marshals in evaluating the appropriate security measures to take with a given prisoner, the court bears the ultimate responsibility for that determination and may not delegate the decision to shackle an inmate to the marshals."); *see also United States v. Henderson*, 915 F.3d 1127, 1135 (7th Cir. 2019) (Hamilton, J., dissenting) ("One central theme of the law of courtroom restraints is that the trial judge is the person responsible for making the decisions. The judge cannot simply delegate that responsibility to the Marshals Service or other correctional or security staff."). We are inclined to agree with the State on this point that the record is best understood to reflect the trial judge's agreement, in the exercise of her independent discretion and oversight, with what deputies recommended as appropriate security measures.

The district court also expressed concern about the possibility that the trial judge may have ordered Wilber to be visibly shackled as punishment for what she perceived to be his disrespect for her authority. That is one way to read the record. When the judge explained her decision to impose the additional restraints, she declared that "Wilber is responsible for

his own predicament and for his own position, that is to be restrained and to have that obvious restraint being shown to the jury." R. 61-28 at 100. She went on to remark upon the fact that Wilber, through his gestures, facial expressions, body language, tone, and spoken words, had "challeng[ed]" the court to find him in contempt and "set[ ] the stage for his defiance throughout the proceedings." *Id.* at 101. She added that she had thought the prior measures she had taken, including her admonitions to Wilber, would suffice to "get him to understand … that such disrespect to the court[,] to these proceedings[,] was not going to be tolerated[.]" *Id.* at 103. But these remarks can also be understood as reflecting the judge's frustration with what she perceived to be Wilber's inability to abide by her rulings and comport himself in a manner consistent with courtroom decorum and the orderly, secure administration of justice. Every judge has a right to expect that a defendant will respect her authority to manage the trial and to comport himself appropriately not only in her presence, inside of the courtroom, but with other court personnel, including security personnel, inside and outside of the courtroom. Indeed, the judge here went on at some length, after describing Wilber's latest altercation with the sheriff's deputies, to identify the concerns that this incident raised both for the security of the courtroom as well as the orderly conclusion of the trial. We have therefore abstained from ascribing any punitive intent to the judge's decision to order additional restraints for Wilber.

As Judge Griesbach emphasized, the key point here is that neither the trial judge nor the state appellate court ever explained why they believed it necessary or unavoidable that such additional restraints be visible to the jury. One can readily accept the trial judge's determination, seconded by the

appellate court, that it was necessary to shackle Wilber's wrists and/or arms at the close of the trial, given his pattern of disruptive behavior, including most recently his physical altercation with the deputies outside of the courtroom. But what is noteworthy, given the care that the court had taken up to that point to ensure that all of the increasing degrees of restraint were hidden from the jury's view, is the court's sudden decision to order the imposition of multiple restraints on his wrists and arms that would be visible (along with the wheelchair) to the jury. The visible nature of the restraints is what defense counsel objected to expressly. It might have been a simple matter to hide those restraints, as the trial judge herself had envisioned previously when she warned Wilber that further outbursts might result in his hands being secured beneath the defense table. And the prosecutor evidently had the same thought when he suggested looking for a blazer for Wilber, presumably to help hide the restraints. Yet the court at that point seemed unwilling to consider any means of hiding the restraints, for reasons that were left unexplained. The appellate court, in sustaining the trial court's decision, noted that the restraints were visible, but never addressed *why* visible restraints were necessary or justified. Given *Deck*'s focus on the inherent prejudice posed by visible restraints, the appellate court's omission is significant.

Certainly there will be cases in which it may not be possible to hide physical restraints. If a defendant is representing himself and has a need to move around the courtroom, for example, there may be no practical way of keeping the restraints hidden. *E.g., United States v. Van Sach*, 458 F.3d 694, 699–700 (7th Cir. 2006). And if a defendant is particularly disruptive and/or uncooperative with measures to cloak the restraints, a court may have no alternative than to allow the jury

to see them. But, so far as the record reveals, this was not such a case. As discussed, the record indicates that the trial judge herself believed it possible to conceal wrist manacles beneath the defense table should she order them imposed. To the extent that still additional restraints on Wilber's wrists were required, including straps of the variety that were placed on one of Wilber's wrists, it might have been possible to hide those restraints with something like a sweater folded in his lap. The shoulder restraints might have been more difficult to conceal, given their location, but as there was no discussion whatsoever of the necessity of visible restraints or the options for concealment, we cannot know.

The state courts' wholesale omission to address the necessity of visible restraints cannot be reconciled with *Deck*'s repeated recognition that it is the visibility of such restraints that is injurious to the presumption of a defendant's innocence and to the dignity of a judicial proceeding. Indeed, the Supreme Court found visible restraints so inherently prejudicial to a defendant that it relieved the defendant of having to show (on direct review) that he was actually prejudiced by a shackling error and instead assigned the burden to the State to prove the harmlessness of the error. Although *Deck* acknowledges that visible restraints may be appropriate when the specific circumstances of a case warrant them, it leaves no doubt that a court's balancing of the need for restraints against the resulting prejudice to the defendant must include consideration of whether the restraints can be concealed from the jury's view: thus the Court's express observation that the Missouri court had never explained why, to the extent restraints were necessary, they must be visible. Confronted with a record that is utterly silent as to the necessity of visible restraints, *Deck* compels a finding that error

occurred. The Wisconsin Court of Appeals' decision to the contrary necessarily amounts to an objectively unreasonable application of *Deck*.

This leaves us with the question of prejudice. The State has argued that the district court erroneously placed the burden on the State to show that the shackling error was harmless beyond a reasonable doubt under *Chapman* rather than placing the burden on Wilber to show that the error had a substantial and injurious effect on the verdict under *Brecht*. But the district court obviated any issue in this regard when it addressed the State's motion to stay its order granting the writ and ordering Wilber's release absent a decision to retry him within 90 days. The court expressly found that Wilber had met the *Brecht* test by raising a "grave doubt" as to whether visibly shackling him at the closing of the trial had a substantial and injurious impact on the jury's verdict. R. 100 at 3-4.

We agree with the district court's finding in this regard. As the Supreme Court's jurisprudence makes clear, visible restraints have long been deemed to be inherently prejudicial to the accused. It was for that very reason that the Court in *Deck* relieved the defendant of having to document the prejudice when a shackling error is raised on direct review. 544 U.S. at 635, 125 S. Ct. at 2015; *see also United States v. Cooper*, 591 F.3d 582, 588 (7th Cir. 2010) (noting that "the Court [in *Deck*] saw nothing even potentially benign in shackles, nor did it suggest that a jury might feel sympathy rather than fear or aversion for a shackled defendant"). It is true enough that Wilber was only confined for the closing phase of the trial, as the attorneys delivered their closing arguments and the judge gave the jury its final instructions. But as Judge Griesbach pointed out, it is at this stage of the trial that a jury is most likely to be

focused on the defendant, as it considers the charge, weighs the evidence and arguments marshaled by counsel, and begins to ponder the defendant's fate. Particularly where, as here, a defendant is accused of a violent crime, his sudden appearance in multiple sets of manacles can only signal that the court itself believes he presents a danger to those in the courtroom, including the jury—and by extension, the general public—and must be physically and forcibly separated from them. At the same time, the State's case, although adequate to support the guilty verdict, was not so overwhelming that we can discount the possibility that the restraints had a substantial adverse effect on the verdict.

To the district court's rationale we would add the point that Wilber's belligerent and violent behavior on the night that Diaz was killed was mentioned repeatedly by the State's witnesses and was a subject of emphasis in the State's closing arguments. As noted earlier, prior to the house party, Wilber had been drinking at a local bar with family and friends. When the bar closed, patrons were invited to continue socializing—in what witnesses called an "after set"— at the house where Diaz and his family lived. By the time Wilber's group left the bar, he was intoxicated and had already shown the first signs of hostile behavior. Jamie Williams was at the bar and testified that Wilber seemed drunk. He had asked her to buy him a beer, and when she declined, he responded, "[F]uck you, bitch." R. 61-23 at 135. Later, at the after party, he walked into the living room of the house and, unprovoked, threatened Leah Franceschetti, "Bitch, I will slap you." *Id.* at 123. Antonia West, Wilber's sister, who herself was intoxicated, described Wilber as being "pretty buzzed up" at the party. R. 61-20 at 96. When Wilber's behavior subsequently escalated from verbal abuse to physical violence, it apparently

did not come as a surprise to those who knew him. Wilber's cousin, Donald Jennings, recalled that he tried to calm Wilber down, "'[c]ause I know my cousin. … [When] [h]e get mad, he get mad." R. 61-21 at 108. Williams recalled that prior to the shooting, she was encouraged to leave the party because "there's going to be some drama." R. 61-23 at 136. Oscar Niles told police he too left the party before the shooting because given "the way [Wilber] was acting, [Niles] felt that it was time for him to go." R. 61-26 at 25.[8] Witnesses used a variety of adjectives to describe Wilber's behavior, including "not acting right" (R. 61-23 at 135), "agitated" (R. 61-26 at 19), "wild, kind of crazy, as if possessed" (R. 61-24 at 290), all of them suggesting that Wilber was, to use a phrase that his sister Antonia West endorsed, "completely out of control" (R. 61-20 at 99). In keeping with that characterization, in the moments leading up to the shooting, Wilber had "tussled" with multiple individuals, knocking or pulling a chain off of Niles' neck, choking Jeranek, and punching Torres hard enough for him to briefly lose consciousness. When individuals like Jeranek and Diaz attempted to intervene and calm him down, Wilber responded with threats. When Diaz admonished Wilber to demonstrate some respect for his house and his family, Wilber reportedly said "I will fuck you up. … I don't give a fuck about you and your family. I'll burn this motherfucking crib down with or without your family." R. 61-24 at 291–92.

It comes as no surprise that the State highlighted the descriptions of Wilber's behavior in its closing arguments to the jury. The emphasis was entirely appropriate, given the defense's own focus on the lack of first-hand testimony

---

[8] Niles later acknowledged that he was, in fact, present when Diaz was shot.

identifying Wilber as the shooter and the physical evidence which raised some question as to whether Wilber could have fired the shot that killed Diaz. Wilber's out-of-control behavior, and his escalating series of threats and altercations in the moments leading up to the shooting, reasonably supported an inference that he was in fact the one who shot Diaz.

But this only serves to confirm why the decision to visibly shackle Wilber at a stage of the trial when the State's counsel was recounting and emphasizing Wilber's behavior was necessarily prejudicial. When the jury heard these arguments, Wilber was in a courtroom, sitting at the defense table, on trial for murder. He was not drunk, at an after-hours party, arguing with other inebriated guests. He had every incentive to behave himself in front of the jury charged with deciding his fate. Yet the visible shackles that he wore for closing arguments signaled to the jury that Wilber was incapable of self-control even when his own freedom was at stake, that the court itself perceived him to pose such a danger that he must be physically strapped to a wheelchair in order to protect everyone else in the courtroom. *See Deck*, 544 U.S. at 630, 125 S. Ct. at 2013 (visible shackling "suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large'") (quoting *Holbrook*, 475 U.S. at 569, 106 S. Ct. at 1346). The visible shackles reinforced the very argument that the prosecutor was making as to why Wilber must have been the person who shot Diaz, effectively signaling that the court itself agreed with the State's characterization of Wilber as "[a] guy who couldn't control himself." R. 61-28 at 130. It is difficult to imagine a more prejudicial action the court could have taken at that point in the trial.

### III.

For all of the foregoing reasons, we agree with the district court that the Wisconsin Court of Appeals' decision finding the evidence sufficient to support Wilber's conviction was not an unreasonable application of *Jackson*. However, we also agree with the district court that the state appellate court's decision sustaining the restraints imposed on Wilber represented an objectively unreasonable application of *Deck*. In the absence of any rationale justifying a need for visible restraints, the decision to visibly shackle Wilber deprived him of his due process right to a fair trial. We sustain the district court's decision to grant a writ of habeas corpus (allowing the State time in which to decide whether to re-try Wilber) on that basis. Like the district court, we find it unnecessary to reach, and do not reach, Wilber's claim of trial counsel ineffectiveness.

AFFIRMED



App. 202